UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Natasha Cade, on behalf of her minor son, B.C., | ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | No. 23-CV-4665 |
| v. | ) ) | |
| | ) | Judge April M. Perry |
| Lamont Bankston, Isaac Kirkwood, and Waukegan Community Unit School District No. 60 Board of Education, | ) ) ) ) | |
| Defendants. | ) ) | |

**OPINION AND ORDER**

Plaintiff Natasha Cade brings this action for injuries her minor son, B.C., suffered while a student at Jack Benny Middle School ("JBMS"). Defendants are JBMS principal Isaac Kirkwood ("Kirkwood"), the Waukegan Community Unit School District No. 60 Board of Education (the "District"), and B.C.'s substitute teacher, Lamont Bankston ("Bankston"). Doc. 13. Plaintiff alleges that her son was injured when Bankston physically attacked B.C. during science class in October 2022. Before the Court is the District's motion for summary judgment. Doc. 61. For the following reasons, the District's motion is granted as to Counts IV and VII and denied as to Count IX.

**BACKGROUND**

The District utilizes substitute teachers to cover classes when a teacher is absent. Doc. 67 ¶ 7. Substitute teachers are not covered by the teachers' union contract and do not receive employment benefits. *Id.* ¶ 8. For positions that might involve longer-term assignments, potential substitutes are interviewed by the school principal or a designee. *Id.* ¶ 30. The District also runs a background check on all substitute applicants and confirms that they have a license to teach but

does not verify their previous employment. *Id.* ¶¶ 31, 33. Substitute teachers are not given training through the District's Department of Crisis Intervention and Safety ("CIS"), which is responsible for training teachers about the requirements of and strategies for use of force in a school. *Id.* ¶¶ 38, 34–35. Instead, the District instructs substitute teachers to actively avoid any engagement with a student about the student's behavior, to avoid close proximity with a misbehaving student, not to stand in front of or block the door or path of a student, and not to use force or restraint on a student. *Id.* ¶ 39. If a behavioral problem occurs, substitute teachers are instructed to seek assistance or leave the classroom. *Id.* ¶ 40. Assistance available to substitute teachers includes contacting the school office, which has CIS-trained personnel, or alerting CIS-trained security personnel who are present in the hallways at each level of the school. *Id.* ¶¶ 42–43. CIS training, for those who receive it, is guided by District Policy 6048. Policy 6048 provides that physical restraint is not to be used in response to verbal outbursts, meaning "student use of profanity or other verbal displays of disrespect for themselves or others." *Id.* ¶ 37.

Bankston applied to be a substitute teacher for the District in February 2022. *Id.* ¶ 6. Bankston began teaching as a substitute at the District's Washington Elementary School during its summer school session in June 2022. *Id.* ¶ 9. Bankston was licensed to teach in Illinois as a substitute and full-time teacher at the time, and his application included prior teaching employment. *Id.* ¶ 10. Before Bankston started in June 2022, the District confirmed his license to teach and ran a background check. *Id.* The background check revealed a 1995 misdemeanor domestic battery conviction. Doc. 64-3 at 16–17.[1]

---

[1] Bankston received a sentence of one-year conditional discharge, a $430 fine, and fifty hours of public service for this offense. Doc. 64-3 at 16–17.

In May 2022, without notifying the District, Bankston applied to work full time for the Zion Elementary School District ("Zion") and was offered a position. Doc. 67 ¶¶ 12–13. Bankston accepted the position and completed his summer school substitute teacher assignment with the District in June. *Id.* ¶¶ 14, 16. Bankston began teaching for Zion full-time in August. *Id.* ¶ 18. In September 2022, however, Bankston stopped working for Zion, ultimately providing Zion with a note from his therapist stating that Bankston was unable to continue working due to "chronic anxiety, depression, panic disorder, mood dysregulation and other unspecified comorbidities." *Id.* ¶ 19; Doc. 64-2 at 175.

In October 2022, B.C.'s science teacher at JBMS resigned and Bankston indicated to the District that he was interested in substituting for this position. Doc. 67 ¶¶ 21, 23. Kirkwood called Bankston to discuss covering the science class, and Bankston was ultimately offered the job. *Id.* ¶¶ 25, 26. The District did not know at the time that Bankston had worked for Zion or was on medical leave. *Id.* ¶ 24. Bankston started working as a substitute teacher for B.C.'s eighth-grade science class on October 17, 2025. *Id.* ¶ 26.

On October 25, 2025, B.C. and his friend A.R. were in science class. Doc. 64-5 at 13–14. They started arguing about a phone, and A.R. told B.C. to "shut the fuck up." *Id.* Bankston, who was substitute teaching that day, looked at A.R. and B.C. and told them to "shut up." *Id.* B.C. replied, "watch your mouth." *Id.* Bankston then walked towards B.C. and got "chest to chest" with him. *Id.* Bankston grabbed B.C. by the hoodie and threw him toward the window. Doc. 67 ¶ 54. Bankston then punched B.C. *Id.* ¶ 55. B.C. started fighting back, "swinging" at Bankston. *Id.* ¶ 56. One of the other students in the classroom started recording a video of the incident after it had begun. *Id.* ¶ 57. The video depicts Bankston, who is significantly larger in size than B.C., repeatedly punching B.C. while B.C. puts his hands up to defend himself. Doc. 64-1. Bankston

then takes B.C. by the hair and sweatshirt and throws his body onto a table, still holding on, before throwing him again into another table while B.C. struggles to stay on his feet as Bankston pulls B.C. out of the classroom. *Id.* There is a break in the video as the two exit the classroom and move out of view. When the camera moves and they are visible again, Bankston is lying with his chest and stomach on top of B.C.'s torso on the floor. *Id.* As a result of the incident, Bankston was charged with aggravated battery. Doc. 67 ¶ 59.

In the operative complaint, Plaintiff alleges four claims against the District: Count IV alleges that the District is liable for deliberate indifference under 42 U.S.C. § 1983 for failing to train and supervise Bankston; Count VII alleges willful and wanton conduct by the District for hiring and failing to supervise Bankston despite knowing he posed a danger to students; and Count IX alleges *respondeat superior* liability. Plaintiff also alleges in Count X a claim for indemnification under state law. The District now seeks summary judgment on Counts IV, VII, and IX. Doc. 62.

## LEGAL STANDARD

Summary judgment is proper when the movant shows that there is no genuine dispute of material fact such that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Although the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact, if that occurs the nonmoving party must present facts showing there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *LaRiviere v. Bd. of Trs.*, 926 F.3d 356, 359 (7th Cir. 2019). To avoid summary judgment, the nonmovant must show more

than metaphysical doubt as to the material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). While the court must construe the facts in the light most favorable to the nonmovant and draw all reasonable inferences in her favor, this obligation does not extend to drawing inferences that are supported by only speculation or conjecture. *See Swetlik v. Crawford*, 738 F.3d 818, 829 (7th Cir. 2013).

## ANALYSIS

The Court begins with Count IV, which alleges that the District is liable for depriving B.C. of his constitutional rights under 42 U.S.C. § 1983 and *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). In *Monell*, the Supreme Court held that municipalities are "persons" who under certain circumstances may be sued under Section 1983, which itself makes liable "[e]very person who, under color of [state law] ... subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983; *see Monell*, 436 U.S. at 690. That said, the Supreme Court also held in *Monell* that "a municipality cannot be held liable solely because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691. Valid theories of recovery for municipal liability under *Monell* include that the municipality had an official policy or a widespread custom or practice that caused the deprivation of the plaintiff's rights. *Id.* Thus, the "critical question under *Monell*, … is whether a municipal (or corporate) policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents." *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017).

Plaintiff's theory of Section 1983 liability rests on the District's policy or widespread practice of failing to train substitute teachers regarding its CIS policy.[2] Defendant argues in response that the harm to B.C. was the result of Bankston's independent criminal act, not any of the District's actions. The Court concludes that Plaintiff's Section 1983 claim fails for two reasons.

First, no reasonable jury could find that Defendant's failure to train Bankston in its CIS procedures caused Bankston's violent attack on B.C. Nothing about the circumstances leading up to the attack or the attack itself suggest that Bankston's battery was caused by a misunderstanding about the appropriate way to engage with a student. Bankston had been instructed that he was not to engage physically with students *at all* and that he should contact the principal's office or a security officer if he believed that behavioral intervention was necessary. This was a clear instruction requiring no interpretation. CIS training, in contrast, provides employees who are allowed to engage physically with students a more detailed and nuanced understanding of how and when to do so. *See* Doc. 67 ¶ 34. No reasonable jury could find that the outcome in this case would have been any different if Bankston had, in addition to being told explicitly not to touch a student, also received CIS training which would have confirmed that he was not allowed to use force against a student in response to a student's verbal outburst.

---

[2] The parties disagree about whether it is the District's policy to not provide CIS training to substitutes or rather whether the District has a widespread practice of ignoring its policy by not training substitutes. Either an unconstitutional policy or a widespread practice of ignoring a constitutional policy could theoretically lead to liability under *Monell*. But either way, the policy or practice must be the cause of a plaintiff's constitutional deprivation. On its own, failure to follow an internal policy does not suffice to establish liability under Section 1983. *See Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003) (holding that Section 1983 "protects plaintiffs from constitutional violations, not violations of state laws or . . . departmental regulations").

Plaintiff's *Monell* claim therefore fails because she does not point to evidence suggesting it was the District, rather than Bankston, that caused B.C.'s injury.[3]

Second, to succeed on a failure-to-train claim brought under Section 1983, the municipality itself must evidence deliberate indifference to the rights of the plaintiff. *See Jenkins v. Bartlett,* 487 F.3d 482, 492 (7th Cir. 2007). Deliberate indifference can be established either through a showing that "in light of the duties assigned to specific … employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights that the deficiency exhibits deliberate indifference," or when there has been a "repeated pattern of constitutional violations" which makes the need for further training "plainly obvious." *Id*. Plaintiff does not point to evidence that satisfies either standard. It is undisputed that Bankston was a substitute teacher who did not have any disciplinary duties.[4] To the contrary, substitute teachers (including Bankston) were explicitly told not to engage with any students who had behavioral issues and were directed to seek assistance from other individuals nearby who were responsible for such interventions. There is therefore no evidence that it was "so obvious" that Bankston needed use of force training or that the failure to train him would likely result in excessive force against students. Nor has Plaintiff pointed to any evidence of "a repeated pattern or widespread practice of constitutional violations that makes the need for further training plainly obvious." *See, e.g.*, *Davis v. Carmel Clay Schs.*, 570 F. App'x 602, 608

---

[3] Plaintiff also references Bankston's history of mental illness and decades-old domestic battery conviction in her argument on causation, suggesting that the District should have known not to place Bankston in a position of supervision over students without proper training. Doc. 70 at 7. But this indicates that Bankston's personal characteristics may have made him unsuited for the role rather than providing evidence that lack of training was the problem.

[4] This case is distinguishable from those cited by Plaintiff that involved school security guards, whose job duties inherently included uses of force. *See, e.g.*, *Wordlow v. Chicago Board of Education*, 2018 WL 6171792 (N.D. Ill. Nov. 26, 2018).

(7th Cir. 2014) ("[T]he School's administration had no basis to think its training was obviously inadequate and, consequently, the School cannot be liable under a 'failure-to-train' theory."). In fact, Plaintiff does not even point to one other inappropriate use of force at the District. As a result, Plaintiff has failed to establish deliberate indifference on the part of the District. For these reasons, the Court grants summary judgment in the District's favor as to Count IV.

Moving to Count VII, Plaintiff claims the District is liable for the state tort of willful and wanton conduct because, according to Plaintiff, it negligently hired and failed to supervise Bankston "despite knowing that Defendant Bankston posed a danger to District students." Doc. 13 at 11.

As a preliminary matter, the Court notes that the District is likely immune from suit on this claim under the Illinois Tort Immunity Act ("ITIA"), which immunizes the District from suit for discretionary acts. *See Crecy v. Kankakee Sch. Dist. #111*, No. 15-CV-1014, 2016 WL 10789394, at *17 (C.D. Ill. June 20, 2016) (citing 745 ILCS 10/1-101). Illinois courts have considered hiring decisions like the District's to come under the ITIA's purview. *See e.g.*, *Johnson v. Mers*, 664 N.E.2d 668, 675 (Ill. App. Ct. 1996) ("[P]laintiffs allege liability based on the ILPD's hiring of a police officer. Such an action is inherently discretionary …").

Even setting the ITIA aside, however, Plaintiff's claim also fails on the merits because no evidence suggests that the District knew or should have known that Bankston was a danger to students. In Illinois, a "cause of action for negligent hiring is proved by evidence that the employer knew or reasonably should have known the person who was hired was unfit for the job" in the particular way that created a danger of harm to others. *Giraldi by Giraldi v. Cmty. Consol. Sch. Dist. No. 62*, 665 N.E.2d 332, 339 (Ill. App. Ct. 1996). Here, the District did not know about Bankston's mental health conditions when it hired him, nor has Plaintiff provided

any evidence that those conditions (anxiety, depression, panic disorder, or mood dysregulation) were inherently indicative of Bankston posing a threat of violence. As Illinois courts have recognized,

> employers may hire the mentally and physically handicapped, who have some degree of unfitness. Such employers, however, do not assume liability because of their employees' unfitness. Liability for negligent hiring arises only when a particular unfitness of an applicant creates a danger of harm to a third person.

*Fallon v. Indian Trail Sch.*, 500 N.E.2d 101, 103–04 (Ill. App. Ct. 1986). Plaintiff hypothesizes that Bankston's mental health issues "made him particularly unpredictable in stressful situations," Doc. 69 at 11, but that type of speculation and conjecture will not do to avoid summary judgment. *See Swetlik v. Crawford*, 738 F.3d 818, 829 (7th Cir. 2013). If Plaintiff wanted to argue that Bankston's mental health diagnoses presented a risk of violence, she should have presented facts demonstrating that those mental health diagnoses presented a risk of violence.

As for Bankston's 1995 misdemeanor conviction for domestic battery, a reasonable jury could not infer from this fact alone that the District should have known Bankston posed a danger of violently attacking a student. Plaintiff does not provide any underlying facts about the conviction, but the sentence of one year of conditional discharge, a fine, and community service, does not indicate that the offense was particularly serious. Moreover, the conviction did not prevent Bankston from receiving a teaching license. Finally, the offense occurred twenty-seven years before the District hired Bankston, and Bankston had no intervening criminal history. None of this indicates that the District either knew or should have known that Bankston was a danger to others.

For similar reasons, Plaintiff's negligent supervision claim also fails. In order to succeed on a negligent supervision claim, Plaintiff must present evidence that the District had a duty to supervise Bankston, that it negligently supervised Bankston, and that such negligence proximately caused B.C.'s injuries. *See Doe v. Coe*, 135 N.E.3d 1, 15 (Ill. 2019) (noting that additional elements are sometimes required under Illinois law). Plaintiff argues these elements are supported by the evidence because the District failed to train Bankston in CIS techniques. But as already discussed, no reasonable jury could infer that the decision to instruct Bankston not to physically engage with students, as opposed to training Bankston on when and how to physically engage with students (which training in this case also would have instructed Bankston *not* to physically engage with B.C.) would have made a difference here. Plaintiff, therefore, fails to point to evidence from which a jury could reasonably infer that the District's supervisory decisions proximately caused B.C.'s injuries. For these reasons, the Court grants summary judgment to the District on Count VII.

Turning finally to Count IX, Plaintiff argues the District is liable under the state law doctrine of *respondeat superior*. "For an employer to be vicariously liable for an employee's tort under the doctrine of *respondeat superior,* the tort must have been committed within the scope of the employment." *Montgomery v. Petty Mgmt. Corp.*, 752 N.E.2d 596, 598 (Ill. App. Ct. 2001). Illinois courts have not defined the term "scope of employment," but have adopted the Restatement (Second) of Agency approach which states that "[c]onduct of a servant is within the scope of employment if … (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; (c) it is actuated, at least in part, by a purpose to serve the master." *Id.* at 598.  In contrast, conduct "is not within the scope of

employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master." *Id.*

Whether an employee's conduct was within the scope of employment "is a question of degree which depends upon the facts of the case." *Rodman v. CSX Intermodal, Inc.*, 938 N.E.2d 1136, 1141–42 (Ill. App. Ct. 2010). Thus, "where the surrounding facts and circumstances leave room for legitimate inferences as to whether, despite the deviation, the employee was still engaged in the employer's business, the question is for the jury." *Pyne v. Witmer*, 543 N.E.2d 1304, 1309 (Ill. 1989). "Summary judgment is generally inappropriate when scope of employment is at issue. Only if no reasonable person could conclude from the evidence that an employee was acting within the course of employment should a court hold as a matter of law that the employee was not so acting." *Id.* at 1308 (internal citations omitted).

The Court finds that the undisputed material facts do not demonstrate that Bankston was not acting within the scope of his employment when he assaulted B.C. It is not determinative that Bankston acted contrary to the instructions that the District gave him. *Gaffney v. City of Chicago*, 706 N.E.2d 914 (Ill. App. Ct. 1998) (noting that the Restatement (Second) provides that an "act, although forbidden, or done in a forbidden manner, may be within the scope of employment"). While the video of Bankston repeatedly punching B.C. is disturbing and in no way reflects the conduct expected from a teacher, the video does not capture the events preceding the assault. And the broader context surrounding the incident leaves open the possibility that a reasonable jury could find that Bankston was motivated at least in part by a purpose to serve the District. Before attacking B.C., Bankston told B.C. to "shut up," from which a jury might infer that Bankston was attempting to bring order to the classroom. And during the altercation, Bankston dragged B.C. by his sweatshirt out of the classroom, from which a jury could similarly infer that

Bankston was trying to maintain discipline. Moreover, the incident occurred during school hours, in a classroom, while Bankston was on duty in his position as a substitute teacher. Thus, while no evidence suggests that Bankston was acting consistently with either school policy or the instructions he had received, the evidence still might be interpreted to suggest that his conduct was at least partially motivated by a desire to do his job. On these facts, the Court cannot say that no reasonable jury could find that Bankston was acting within the scope of his employment. Summary judgment is therefore denied as to Count IX.

## CONCLUSION

Defendant's motion for summary judgment is granted as to Counts IV and VII. Summary judgment is denied as to Count IX.

Dated: January 9, 2026

_____
APRIL M. PERRY
United States District Judge